UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NICOLE KOLTICK,                    :

    Plaintiff                    :        **CIVIL ACTION**

    v.                               :        **NO. 26-**


DREXEL UNIVERSITY,          :        **JURY TRIAL DEMANDED**

    Defendant                   :

## COMPLAINT

## I.    PRELIMINARY STATEMENT

Nicole Koltick brings this action for disability discrimination, interference, and retaliation against Drexel University ("hereafter Drexel"), under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq*., the PHRA, *et seq*., 43 P.S. § 955(a), stemming from its refusal to extend her remote teaching accommodations for the 2022-23 academic year, not because they were unreasonable, infeasible, or would constitute an undue hardship, but as a matter of institutional policy to require all faculty to return to in-person teaching. Professor Nicole Koltick was a highly regarded and fully tenured Associate Professor and innovative researcher in Drexel's Department of Architecture Design, & Urbanism (hereafter "the Department"), who, with a remote work accommodation, had been, and continued to be fully capable of fulfilling all of the essential job functions of her faculty position at a high level of proficiency according to all of Drexel's own metrics, notwithstanding the debilitating chronic disability which by 2023 had left her essentially homebound.

Knowing that without remote accommodations Professor Koltick could not work at all, Drexel demanded that she return to work on-campus like everyone else by May 15, 2023 under

the University's post- pandemic re-opening plan, *i.e.*, without the remote accommodation she needed to access the workplace, and which Drexel could have provided without significant difficulty or expense. When she was unable to do so, Drexel brought disciplinary charges against her for "gross misconduct" and job abandonment. After a Committee of the Faculty Senate recommended that the Charges be sustained, the Provost revoked Professor Koltick's tenure and terminated her employment on January 3, 2024.

Drexel's refusal to grant Professor Koltick a remote work accommodation that it could have provided without undue hardship and then its construction of her disability-related inability to return to campus as an intentional, deliberate act of insubordination is discriminatory, retaliatory, and constitutes interference with her statutory rights under the ADA and the PHRA. She therefore seeks declaratory and injunctive relief requiring Drexel to reinstate her tenure and return her to active duty with remote accommodations, restore all the emoluments of employment she has lost or will lose as a result of its illegal actions, including, but certainly not limited to, back pay and front pay, and compensate her for the physical and emotional distress and other losses she has suffered because of Drexel's intentional, malicious and reckless conduct.

## II.  JURISDICTION AND VENUE

1.      Jurisdiction is predicated upon Titles I and V of the Americans with Disabilities Act, 42 U.S.C. § 12112 and 12201, *et. seq*. Jurisdiction is further predicated upon 28 U.S.C. § 1331, this being an action arising under the laws of the United States. Jurisdiction over the PHRA claim is predicated upon 43 P.S. § 962 (c ) and the court's supplemental jurisdiction.

2.      Venue lies in this court pursuant to 42 U.S.C. §12117 (a) because all of the events that give rise to this Action took place in this district.

**III.      PARTIES**

3.      Nicole Koltick is a citizen of the United States who currently resides at 506 Ridge RD SW, Largo, FL 33770.

4.      Ms. Koltick is a qualified individual with a disability as defined by the ADA. Likewise, she is an employee and a person with a disability and/or "non-job-related handicap" as defined by the PHRA. 43 P.S. §954 (p).

5.      Defendant Drexel University is a private research university in Philadelphia, Pennsylvania, one of the 10 largest employers in the city, with more than 10,000 faculty and professional staff, and about 20,000 students. Its administrative offices are located 3141 Chestnut Street, Philadelphia, PA 19104.

6.      Drexel is an employer as defined by the ADA and the PHRA.

**IV.      ADMINISTRATIVE EXHAUSTION**

7.      Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on February 1, 2024 alleging that Drexel's actions against her constitute illegal disability discrimination, interference and retaliation under the ADA.

8.      Plaintiff filed a companion charge of discrimination with the Pennsylvania Human Relations Commission (PHRC) on June 26, 2024.

9.      Because the PHRC complaint duplicated the charges already under investigation by the EEOC, the PHRC unilaterally issued an Intake Closure Notification on July 9, 2024, which is attached to this Complaint as Exhibit "B."

10.      On March 17, 2026, Plaintiff requested and received a Right to Sue Letter from the EEOC, which is attached to this Complaint as Exhibit "A."

IV.    STATUTORY AND REGULATORY BACKGROUND

11.    The ADA and the PHRA make it illegal for covered employers to discriminate against qualified individuals and/or deprive them of equal terms and conditions of employment on the basis of their disabilities.[1] 42 U.S.C. §1211, *et seq*., and 43 P.S. §952, *et seq*.

12.    The statutory definition of discrimination under the ADA includes, among other things, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," including, *inter alia,* denying job opportunities because the individual needs an accommodation. 42 U.S.C. §12112 (b)(5)(A).

13.    The ADA forbids covered employers from denying any employment opportunity to a qualified employee because of the need to make reasonable accommodation to the physical or mental limitations of that employee. 42 U.S.C. §12112 (b)(5)(B).

14.    Reasonable accommodations may include, *inter alia*, making existing facilities used by employees readily accessible to and usable by covered individuals, as well as job restructuring, modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices. 42 U.S.C. §12111 (9).

15.    Reasonable accommodation may also include making adjustments or modifications to employment policies, to the work environment, and/or to the manner or circumstances under which the position held or desired is customarily performed to enable the individual to perform the job and/or to enjoy equal benefits and privileges of employment in

---

[1]    The statutory protections under the ADA are likewise applicable to the PHRA. For purposes of concision, the term "ADA" in this Complaint denotes both of these provisions unless otherwise specified.

relation to similarly situated employees without disabilities. 42 U.S.C. §12119; 29 C.F.R. §§1630.2 (o) (ii)-(iii).

16.    Requests for remote accommodations, like all others, must be evaluated on an individualized basis and provided in accordance with the law unless such accommodation would entail undue hardship, *i.e.*, significant difficulty or expense to the institution. *See generally EEOC's Policy Guidance on Work at Home/Telework as a Reasonable Accommodation* (2003).

17.    The ADA prohibits employers from limiting, segregating, or classifying any employee in a way that adversely affects her employment opportunities or status on the basis of disability. Likewise, it forbids employers from employing standards, criteria, or methods of administration which have the effect of discriminating against such individuals unless they are job-related and consistent with business necessity. 42 U.S.C. §12112 (b)(1) & (b)(3 ).

18.    Qualification standards that screen out or tend to screen out an individual with a disability or a class of such individuals constitutes discrimination under the ADA unless they are job-related and consistent with business necessity. 42 U.S.C. §12112 (b) (6).

19.    The ADA forbids discrimination against any person because she has complained of or opposed any act or practice made unlawful by the Act, or participated in any manner in a proceeding related to the discrimination it prohibits. 42 U.S.C. §12203 (a).

20.    The ADA also forbids coercing, intimidating, threatening, or interfering with an individual in the exercise or enjoyment of, or on account of her having exercised or enjoyed, the protections of the Act. 42 U.S.C. §12203 (b).

STATEMENT OF FACTS

A.    PROFESSOR KOLTICK'S TENURED POSITION AT DREXEL

21.    Throughout her sixteen years at Drexel, Professor Koltick was a highly regarded teacher, productive researcher of international repute, and well respected for her years of dedicated and collaborative service to the Westphal College of Media Arts and Design (hereafter "the College"), and more broadly to Drexel University itself.

22.    Professor Koltick came to Drexel in 2008 as an Assistant Teaching Professor in Westphal's Department of Architecture Design, (hereafter "the Department"), and served as Program Lead for Computational Design.

23.    Professor Koltick has a degree in Fine Arts, a master's degree in Architecture, and a Ph.D (all but dissertation) in Philosophy, Art, and Critical Thought (Digital Design).

24.    During her time at Drexel Professor Koltick taught a wide range of courses in architecture and design as well as many cross-disciplinary courses, but her primary academic focus was in innovative design and critical design theory.

25.    In 2012 Professor Koltick was dually appointed to the Department's MS Interior Interior Architecture and Design and also to its MS Design Research programs.

26.    To advance her research and with financial support from the College, Professor Koltick founded the Design Futures Lab in 2012, which she directed until the Dean sent her home on administrative leave on May 16, 2023.

27.    Through the venue of the Design Futures Lab, and in collaboration with researchers from other disciplines at Drexel and beyond whose work fell outside the realm of traditional design, including computer science, biology, engineering and bio-medical

engineering, Professor Koltick pursued and taught graduate trans-disciplinary research at the intersection of design, science, technology and aesthetics to imagine and create the designed future.

28. Drexel granted Professor Koltick tenure in 2016, whereupon she was promoted to the position of Associate Professor.

29. The scope of her teaching is extensive, as is her scholarship and service to the University, and Professor Koltick was widely known and respected as an innovative design researcher, which is the primary focus of her scholarship and her teaching, which was primarily at the graduate level.

30. Among the other things Professor Koltick did during her time at Drexel, she authored or co-authored multiple peer-reviewed papers and other published writings, presented works at many national and international conferences, and received recognition and high praise for her scholarship and research from subject experts around the world.

31. Over the years, Drexel recognized and rewarded Koltick's innovative teaching and creative scholarship with a number of awards, grants and fellowships, including, *inter alia*, the Westphal College of Media Arts & Design Faculty Creativity Award (2015), Areas of Research Excellence Grant (2017), SEED Project for Community Engagement Grant (2018), and Rapid Response Research & Development Grant for Racial Equity (2020), and the Freddie Resiman Faculty Scholarly and Creative Activity Award (2021).

**B.    PROFESSOR KOLTICK IS A QUALIFIED PERSON WITH A DISABILITY**

32.    Professor Koltick has struggled for most of her adult life with a number of chronic medical impairments, including a serious, progressive multi-system illness that causes extreme pain and significantly restricts her ability to carry out many major life activities, including, *inter alia*, standing, moving, walking, caring for herself and traveling outside her home.

33.    The manifestations of her disabilities have varied in their severity from time to time, but have been chronically, cumulatively and progressively debilitating, and since approximately 2018, have left her without the stamina to endure many of the physical demands of in-person activities.

34.    By the spring, 2023, Professor Koltick was approximately 90% homebound, but with remote work accommodations, she remained fully capable of performing all the essential functions of her job at Drexel – teaching, service, and research – the three criteria upon which the University evaluates faculty performance.

**C.    DREXEL, ALREADY A LEADER IN REMOTE TEACHING, EASILY TRANSITIONED TO FULLY REMOTE WORK DURING THE COVID-19 SHUTDOWN BEGINNING IN MARCH, 2020, AND REMAINED FULLY REMOTE THROUGH THE CONCLUSION OF THE STANDARD 2020-21 ACADEMIC YEAR**

35.    For much of the last decade, Drexel has marketed itself as a cutting edge leader in remote and emerging hybrid learning technologies, which it correctly perceives as central to the future of higher education and an important strategy for recruiting from new student markets.

36.     The University offers over 250 completely online degree and/or certification programs, including MS Digital Design, a degree program in Westphal College, which is closely related to Professor Koltick's skill set.

37.     For many years before the Covid-19 shutdown and ever since, Drexel has increasingly offered on-line course options to students across a wide variety of disciplines, including but certainly not limited to architecture and design as well as other programs in Westphal College.

38.     By the time the shutdown occurred, Drexel already had on board a dedicated team of instructional designers, media producers, and technical staff that collaborated with faculty to support remote teaching with the highest quality equipment and technical support, and to develop and expand faculty competence for remote teaching.

39.     For the 2019-20 academic year (pre-pandemic), Drexel offered approximately 15% of its undergraduate courses in various remote modalities. That percentage was higher for graduate courses.

40.     When the Covid-19 shutdown happened, Drexel was uniquely positioned to readily transition all of its in-person courses to fully online delivery format.

41.     Drexel's commitment to expanding and supporting remote course offerings has continued since the pandemic.

42.     Strategic Plans for both the University and Westphal College seek to promote remote learning to advance the University's overall capacity as an industry leader in  innovative remote programming and course delivery across a wide spectrum, from undergraduate and graduate to lifelong learning programs.

D.    **PROFESSOR KOLTICK TEACHES AND WORKS REMOTELY DURING THE COVID-19 SHUTDOWN FROM MARCH - JUNE, 2020 AND THE 2020-21 ACADEMIC YEAR AND IS RECOGNIZED AS AN INNOVATOR IN REMOTE TEACHING MODALITIES**

43.    From March, 2020 through the rest of the 2019-20 academic year, Professor Koltick, like other faculty across the University - indeed, across the country – taught, held office hours, and conducted her other professional obligations remotely at a high level of proficiency according to Drexel's own performance metrics.

44.    Pursuant to the Governor's Emergency Order, Drexel continued to operate fully remotely for the 2020-21 academic year, as did Professor Koltick, who successfully taught her classes synchronously, and remotely conducted all of her other work activities with a high level of proficiency.

45.    By this time Koltick had become a well-recognized innovator in the use of remote learning technologies in Westphal College.

46.    In January 2021, the Dean appointed Professor Koltick to an administrative post as Associate Program Director of the Westphal College's graduate Design Research Program, supplemental to her faculty position, tasking her with, among other things, thesis coordination as well as marketing, recruitment and admission initiatives, curriculum development and oversight, and investigation into and the development of new content delivery methods, including remote and low-residency offerings.

47.    Koltick's overall performance rating for 2020-21 was 4.7/5.0. Her Department Head (also her supervisor) described her teaching as excellent, the trajectory of her research agenda as cutting edge, her service to Drexel's technological innovation excellent, and her

professional service both inside and outside the University laudable.

48. Among her other accomplishments during the 2020-21 academic year, Professor Koltick received Drexel's *Freddie Reisman Faculty Scholarly and Creative Activity Award* for excellence in teaching and professional service.

### D. 2021-22: DREXEL RETURNS PRIMARILY TO FACE-TO-FACE TEACHING BUT ALLOWS PROFESSOR KOLTICK TEACH REMOTELY

#### 1. The Provost's Return to Campus Directives for Fall Term

49. In a faculty-wide communication on May 14, 2021, the Provost announced plans for the return of normal in-person capacity for the upcoming Fall Semester. Courses that had been scheduled to be remote for capacity reasons were to be converted to face-to-face ("FTF") or hybrid delivery.

50. Recognizing that many faculty would not be able to return to campus for the 2021 Fall Term due to their own health conditions or those of their families, the Provost issued a faculty-wide communication on August 27, 2021 expressly communicating Drexel's intention to abide by its legal duties to provide reasonable remote work accommodations for faculty as reasonably necessary to enable them to perform the essential functions of their jobs and/or to access the workplace on an equitable basis as required by federal and state disability law.

51. Flexible Work Arrangements ("FWA") would remain available for remote work would be subject to approval by academic Departments.

52. The Provost directed faculty seeking remote work as a disability accommodation under federal and/or state disability laws to submit their requests to HR which, pursuant to Drexel's established protocols, is solely responsible for handling such requests, not the

Departments and not Drexel's administrators.

53.    If HR grants the request for reasonable accommodations (hereafter "RA requests"), including, *inter alia*, remote work accommodations, the Department has the responsibility for implementing them.

54.    Approximately 15 per cent of Drexel's undergraduate courses for the 2021 Fall Term were offered on-line or delivered remotely pursuant to departmentally-approved FWA's and HR-approved accommodations.

### 2.    2021-22 Fall Term: Professor Koltick Works Remotely Under a FWA

55.    By the Fall of 2021, Professor Koltick's condition had deteriorated to the point that it was very difficult for her travel, and seriously impeded her ability to function independently outside her own home.

56.    Professor Koltick worked remotely during the 2021 Fall Term under a Department-approved FWA.

57.    When her request to extend her FWA past the mid-term met with resistance from her Department, Professor Koltick sought direction and assistance from HR as the Provost had instructed.

58.    Professor Koltick submitted a formal request to HR on October 19, 2021 for a fully remote work schedule for the Winter Term, followed a few weeks later by a request to work remotely for the Spring Term.

### 3.    HR Approves Remote Accommodations for 2021-22 Winter and Spring Terms

59.    Without controversy or dispute from the Department, HR granted Professor Koltick's successive requests for remote accommodations for the 2022 Winter and Spring Terms.

60.    HR conducted the entire RA process for each of those requests in less than two weeks, and approved both of them.

61.    Pursuant to HR's directives, the Department converted Professor Koltick's in-person classes to remote instruction for 2022 Winter and Spring Terms, all without significant difficulty or expense to the University.

62.    Recognizing that faculty do not have typical job descriptions because of the individualized and fluid nature of their positions, which not only vary from department to department and program to program, but within departments and programs, and often change over time, depending on the faculty member's evolving research interests and expertise, HR worked with Professor Koltick and her Department to define the specific responsibilities of her job as they related to the three essential functions of all faculty positions, which are teaching, scholarship and service.

63.    All the parties, including HR and all relevant Department Heads, agreed on the fundamental components of Professor Koltick's job functions in all three essential domains of teaching, scholarship and service, none of which include or specify teaching in-person or in any specified modality.

64.    In October, 2023, during the tenure revocation hearing, the parties agreed that the essential functions of Professor Koltick's job did not change after they were assessed and agreed

upon during the RA process in November, 2021.

**4.      Professor Koltick Successfully Performs Her Job
Remotely in all Three Essential Domains During the
2021-22 Winter and Spring Terms**

65.      In addition to successfully teaching her full course load remotely for the 2022 Winter and Spring Terms, Professor Koltick was fully engaged in multiple service and scholarly projects both within and outside the University, including two innovative proposals that were accepted for a high level national symposium.

66.      As Primary Investigator, Koltick brought together a broad, highly diverse, and multi-disciplinary team from within and outside the University to design an ambitious NSF grant proposal entitled *Co-Creating Equitable Access: An Inclusive Approach to Spacial Justice in the Urban Built Environment*.

67.      It was unprecedented in the field for a non-STEM design researcher to serve as Lead PI in a proposal of this type.

68.      Ultimately, the NSF proposal was not accepted, but it received encouraging feedback that bode well for future submissions and provided the groundwork for future projects.

69.      After being named to Westphal College's Committee for Implementing its Strategic Plan, Professor Koltick took a leadership role on the Future of Teaching & Teaching Spaces Sub-Committee which was responsible for developing recommendations for cutting-edge hybrid and online curricular approaches and flexible options in addition to or alongside current in-person learning. She continued to successfully fulfill the duties of that service position until her last day at Drexel on May 15, 2023.

E.    **2022-23: PURPORTEDLY BASED ON THE PROVOST'S 2021 "POLICY AND MANDATE" FOR ALL FACULTY TO RETURN TO CAMPUS, WESTPHAL COLLEGE RESISTS AND SABOTAGES PROFESSOR KOLTICK'S REQUEST FOR REMOTE ACCOMMODATIONS AND PLACES HER ON ADMINISTRATIVE LEAVE PENDING DISCIPLINARY ACTION**

a.    **Fall Term**

70.    Although she had taught and worked fully remotely for the past two years, and her Department was aware of her ongoing need for such accommodation, the DH unilaterally scheduled all of Professor Koltick's classes for in-person delivery for the Fall Term, which started on September 19, 2022.

71.    Purportedly in adherence to the 2021 announcements from Provost's and the Dean's offices to bring all faculty back to campus, which Drexel's Advocate during the October 2023 Tenure Revocation hearing labeled as "policies and mandates," the DH refused to convert the course modalities for Professor Koltick's classes so she could teach them remotely, although the Department could have done so without significant difficulty or incurring significant expense to the University.

72.    Professor Koltick contacted the HR disability consultant on September 6th to request an extension of her remote accommodations, only to learn that he was no longer there.

73.    Recent staff changes in HR delayed and confused what Professor Koltick reasonably expected from her past experience would be a seamless and expeditious process for extending the same remote RA's that had been twice approved the previous year.

74.    The unexpected delay and lack of direction from HR left Professor Koltick in the position Drexel's own RA policy is intended to avoid, having to converse directly with her new

15

Department Head, recently appointed in July, 2022, about her disability and her need for ongoing remote accommodations in order to get them in place before classes started.

75. The DH told Professor Koltick that even if the Department agreed to convert some of her courses to remote delivery, it would be subject to approval from the Provost.

76. Pursuant to Drexel's ADA policy, HR, not the Provost, decides accommodation requests. The Administration, the College and the Department are required to make the accommodations HR directs, which is exactly what they all did the year before.

77. The unexpected impediments, uncertainty and stress surrounding her accommodations for the Fall term exacerbated Professor Koltick's already tenuous state of health, forcing her to take FMLA leave until December 5, 2022.

78. Koltick notified both HR and her Department in writing that she was planning to teach in the Winter term, and that she would need remote accommodations to do so.

79. The DH unilaterally scheduled three of Professor Koltick's five scheduled graduate classes for Winter Term to be delivered in-person.

80. Professor Koltick had taught all of those classes remotely in the past, and at least one section of each of those courses is routinely offered each year in a remote format.

81. Not only was there no technical barrier to allowing Professor Koltick to teach those classes remotely, but because of the nature of the courses, the instruction would be delivered digitally, regardless where she was physically located.

### b. Winter Term

82. On November 28, 2022, while still on FMLA, and nine weeks before the Winter term was set to begin, Professor Koltick re-submitted her request to HR to extend her remote

work accommodations from 2021-22, which the Department had implemented without complaint the year before.

83.    The ongoing disorganization in HR delayed the commencement of the RA process by more than 3 weeks.

84.    The new HR disability coordinator, Katherine Shannon, had previously served as the Department's HR Business Manager, whose role was to work with the Department administrators and senior leadership to support their business objectives.

85.    Professor Koltick met with Ms. Shannon for an "interactive process meeting" (IAP) on December 16, 2022.

86.    Meanwhile, having returned from her FMLA leave on December 5th, Professor Koltick had resumed her service and scholarship activities and was proceeding with her course preparations for the Winter term.

87.    The December 16th IAP meeting with Shannon was the only one Professor Koltick ever had during what turned into a nearly 9-week process, culminating in the denial of her RA request on January 25, 2023.

88.    Without any further consultation with Professor Koltick, Shannon told her in an E-mail on December 19th that the Department "cannot provide her a 100% remote teaching for Winter.

89.    Shannon presented Professor Koltick with a list of "alternative accommodations" that had not been discussed during the IAP, but unilaterally devised by the Department, and would not only would require her to teach in-person, but to work on campus well beyond what was required of other faculty.

17

90.     Shannon's E-mail said that if Professor Koltick did not think the alternative accommodations are "sufficient, and *remote work is the only option*, please let me know and I will review further with "my team," and "we'll get a meeting scheduled to discuss further."

91.     Professor Koltick confirmed on December 22, 2022 that because of her "ongoing chronic illness," she "will still need to request 100% remote work as an accommodation," and asked "what the next steps would be." ... "I am aware the Department would like to resolve this before the break so if you and I need to meet tomorrow please let me know."

92.     Months later, during the October, 2023 tenure revocation hearing, Shannon claimed for the first time that Professor Koltick's December 22nd E-mail, which Shannon received more than a month before she denied Koltick's RA request, "shut down" the IAP, and that neither Shannon nor the Department had any intention of engaging in the IAP any further.

93.     Both before and after Koltick's December 22, 2022 E-mail, Shannon stated in writing that the IAP was ongoing, that no decision had been made, and that if Koltick still needed a fully remote RA, they "could circle back" and talk about that.

94.     At no time between December 19, 2022 and January 25, 2023, when Shannon formally denied the RA, did she ever ask Professor Koltick for any additional documentation, nor did she invite her to meet with HR or anyone else on Shannon's "team" or offer her any opportunity to see, hear or respond to anything they were discussing.

95.     During that same time period, Shannon proceeded to meet and communicate multiple times with the DH.

96.     The Dean of Westphal College pressed Shannon to deny the accommodation purportedly on the Provost's 2021 mandates requiring all faculty to return to work on campus,

and the College's ensuing decision to require all faculty to teach on campus.

97.     Unbeknownst to Professor Koltick, the DH had decided to rush Koltick's 2021-22 performance evaluation process to bolster the Department's pitch to HR that the Winter, 2023 RA be denied.

98.      On December 5, 2022, the same day Professor Koltick returned to work from FMLA, the DH demanded that she immediately initiate her performance evaluation ("FAR") for the previous academic year (2021-22).

99.     Earlier that day, the new HR Business Partner notified Professor Koltick and the DH that the deadline to submit her FAR had been extended for 60 days to account for the time she had been on FMLA.

100.    Under the University's typical evaluation protocol, the employee does not submit the FAR to the DH until after receiving and having an opportunity to review and respond to the DH's comments.

101.    On Koltick's third day back from FMLA, 57 days before her FAR was due, the DH instructed her to submit it without waiting for the DH's comments.

102.    The DH made a number of comments on the Evaluation that were factually false and deliberately misleading to undermine Koltick's request for remote work accommodations and secure HR's denial of the request:

> a.     The DH falsely reported that Koltick taught remotely in 2021-22 without permission.

b.    Based on isolated comments from otherwise highly positive student course evaluations, the DH falsely portrayed Professor Koltick as having failed to meet student needs while she was teaching remotely.

c.    The DH omitted the many positive student comments regarding the courses in general, their overall satisfaction with Professor Koltick's teaching, and benefits they derived from remote delivery.

d.    Most of the "negative" comments the DH noted were from the 1st year under-graduate course Professor Koltick had never taught before in any modality, and had been assigned to her at the last minute.

e.    The DH also cobbled together a number of anecdotal "complications" she claimed Koltick's working remotely had caused for her colleagues during the current year, *which was not under review*, and had no bearing on her last year's performance.

103.    Although the DH rated Professor Koltick's service and scholarship as Excellent/Superior, *i.e.*, 5.0/5.0, she relied on the purportedly negative feedback she picked out of the overwhelmingly positive student course evaluations to give Koltick a 3.0/5.0 in the essential domain of teaching, for a final cumulative rating of 4.3/5.0.

104.    Although a score of 3.0 for teaching means that Professor Koltick "fully achieved expected results," that was the lowest rating for teaching she had ever received in her career.

105.    The DH did not supervise Professor Koltick during the 2021-22 academic year, and had only limited contact with her. She had never seen her teach, had very limited knowledge about what she taught or how the instruction was provided in her classes, or by whom, nor did she ever request to review any of the recordings of Koltick's teaching during the applicable review period.

106.    The DH designed the teaching score and the purported rationale for it specifically to undermine Koltick's request for a remote teaching accommodation.

107.    The DH issued the final evaluation report on December 22nd and sent it immediately to HR, where it was used as a basis for denying Professor Koltick's RA request.

### c.    HR Denies the Remote Accommodation Request for Winter 2023

108.    In her January 25th RA denial letter, Shannon relied heavily on the negative commentary the DH included in Koltick's recent performance evaluation for the previous academic year for Teaching as well as "additional information" she claimed to have received from the Department, none of which had ever been shared, then or ever, with Professor Koltick.

109.    Shannon stated in the RA denial that "there had been a determination that in-person work on campus was an essential function" of Professor Koltick's job.

110.    The fundamental duties of Professor Koltick's job had been agreed upon during the essential functions evaluation during the Fall, 2021 RA process, had never been disputed, and did not specify where, how, or in what modality she would teach.

111.    Shannon reiterated exactly the same list of proposed alternative "accommodations" she conveyed more than a month earlier in her December 19th E-mail, which were not only not effective, but in some cases were affirmatively discriminatory, and which she

had expressly offered to "circle back and discuss" if Professor Koltick believed that she still needed a fully remote work schedule.

112. Without ever asking Professor Koltick what she teaches or what she does at Drexel, or what she was qualified to teach and/or to do in light of her extensive experience and wide expertise, Shannon asserted that the Department was unable to find enough remote course assignments in its degree programs to allow her to fulfill her annual teaching load.

113. On average, Professor Koltick taught between four and six courses in the standard academic year, 90-95% of which comprised Graduate courses and thesis advising at both the Master's and Doctoral level.

114. Professor Koltick is qualified to teach across many disciplines and degree programs in her own Department, spanning, *inter alia*, Design Studios, Representation, Technology Advanced Computational Design, Design Theory, BioDesign, Speculative Design, Digital Media, and Digital Fabrication. She also has a long and successful history in graduate thesis advising, which is typically a one-one faculty/student teaching experience extending through the duration of a degree program, and is often conducted remotely.

115. Not only was there no evidentiary basis for Shannon's conclusion that Professor Koltick had not met the needs of her students when teaching remotely, but her conclusions that she was unable to meet the essential functions of service and research without being present on campus was also baseless.

116. Neither Koltick nor any other professor in the Department had ever been required to conduct their research on campus, and on her recent evaluation the DH gave her the highest possible score in that domain, as had all of Koltick's previous supervisors over the course of

many years.

117.    Not only did Koltick perform all of her service activities remotely, as did 90% of the other people working on the same committees she was, but on her recent evaluation the DH gave her the highest possible score in that domain.

118.    HR denied Professor Koltick's RA request in capitulation to the demands by the DH and the Dean, neither of whom, under Drexel's own RA policy, had any authority to decide, much less control the RA decision.

119.    Neither Shannon nor anyone else in HR ever spoke with Professor Koltick to ascertain whether and to what extent she could successfully continue to teach her scheduled courses remotely without undue hardship to the University, as she had been doing during the past three years, without objection or dispute from the College or the Department.

120.    By the time HR denied her RA request on January 25th, the Winter term had been in session for three weeks, and Professor Koltick was already teaching her classes remotely with the knowledge of her Department, and without imposing any significant difficulty or expense on the University.

121.    Professor Koltick was also fully engaged in her research and service work, all of which she was doing remotely. In addition to running the Design Futures Lab, she was a key contributor to the Westphal's sub-committee of the Future of Teaching and Learning, the Westphal Research Council, and was heavily involved in the accreditation process for the Interiors Department.

**d.    Koltick Appeals the RA Denial and HR Erroneously Upholds It**

122.    After meeting with her Department and HR regarding the options left to her as a result of Shannon's RA decision – return to campus or resign – Professor Koltick appealed the RA denial to Drexel's Senior Vice President for HR, Megan Weyler on March 8, 2023.

123.    On March 29, 2023, although Professor Koltick was then, and had been successfully teaching courses, supervising her graduate thesis students, and conducting all of her service and research activities remotely, Weyler denied her appeal.

124.    Weyler claimed to have rendered her decision after the full involvement of the Department, the Administration, "and other relevant stake holders" in the College and in HR.

125.    Weyler did not speak to or otherwise involve Professor Koltick.

126.    The appeal denial was pre-determined, factually baseless, and driven by the Department and the Dean, both of whom told HR that a fully remote teaching schedule was not how they were going to proceed.

127.    Claiming to have educated herself on Professor Koltick's "specific discipline" and the needs of her Department, Weyler concluded, without mentioning any of Koltick's specific disciplines, that a 100% remote RA was no longer reasonable because, she said, it was vital to the effective performance of the essential job functions of her faculty position – teaching, scholarship, and research – that she have a physical presence on campus.

128.    Not only did Weyler never speak with Professor Koltick, but in her Decision she made no reference to any of the extensive materials Koltick had submitted to educate Welyer about her primary disciplines as well as her long track record of inter-disciplinary work across a wide range of degree programs within the Department, the College, and the University at large.

129. During the October, 2023 tenure revocation hearing, Weyler admitted that it was not necessary, much less vital, that Professor Koltick's service, research or scholarship activities be conducted on campus.

130. Weyler's conclusion that the Department could not assign Koltick enough remote courses to fill her schedule was factually baseless, as it had been doing so for the past three years, and could have continued to do so had it simply converted her courses to remote delivery, as it did the previous year when HR ordered it, without significant difficulty or expense to the University.

131. At no time during the accommodation process or the appeal did anyone speak with Professor Koltick about what else she could teach if the Department was unable to or simply refused to assign her to teach her scheduled courses remotely.

132. Relying heavily on the negative snippets the DH incorporated into the 2020-21 Performance Evaluation from the anonymous but overwhelmingly positive student course evaluations, Weyler concluded that Professor Koltick could not meet student needs unless she taught in-person, something she would have known to be false had she reviewed those course evaluations, all of which contained very positive comments about Koltick's teaching.

133. Weyler ignored the multiple letters in which approximately 18 of Professor Koltick's students expressly and emphatically indicated how satisfied they were with her remote instruction and her valuable contributions to their educational experience at Drexel, many of whom came to Drexel because of her.

134. Weyler never shared any of the student letters with any of "the stakeholders," did not speak with any of the students, and made no reference to any of their written input in her

decision.

135.    Weyler's decision directed Professor Koltick to meet again with her DH and HR to determine how much of her teaching, research and service responsibilities actually required on-campus presence.

### c.    Spring Term

136.    Both before and after her appeal was denied, Professor Koltick continued to seek clarification from HR and her Department as to what her options would be if her appeal was denied, not only because she was not able to return, but also given her status as a tenured professor and the needs of her graduate students, most of whom would soon be completing their thesis projects and defending their theses under her supervision.

137.    With her appeal still pending and the 2023 Spring Term approaching, Professor Koltick made multiple efforts to secure remote teaching assignments from her Department for Spring Term, all of which the DH and/or the Dean impeded or denied.

138.    Claiming to be unable to find courses that could be taught remotely, the DH denied Professor Koltick's request to teach a graduate course she had taught many times, and which the Provost had specifically approved for remote delivery the year before, unless she did so in-person.

139.    The DH claimed that there were no other courses that could be considered for assignment to Professor Koltick because they had already been assigned to other faculty.

140.    The Spring term began on April 3, 2023, four days after Professor Koltick's appeal was denied, so in the meantime, she had begun remotely teaching the one course still on her roster, Thesis Design Research II, in which she provided instruction and intense supervision

for a cohort of six Master's students, all of whom had been working closely with her over the past two years on their thesis projects  – all remotely–  and were now in the final two weeks of their preparations for defending their theses.

141.    Although the thesis course had been offered remotely for many years, and Professor Koltick had taught it remotely, as had others in her Department, the DH listed it as FTF, which was not necessary to course delivery, not what the students wanted or expected, but done in deliberate effort to force Professor Koltick back to campus without the accommodation she needed to access the workplace.

142.    Although she had a heavy load of ongoing service and research activities, the DH's and the Dean's adamant refusal to offer Professor Koltick a remote teaching schedule on the ground that all faculty must teach in-person left her – a tenured professor and top performer in her College and Department, with undisputed credentials, uniquely wide experience, and extensive cross-disciplinary expertise, and with a pending RA appeal - without the minimum course load necessary to fulfill the teaching component of her contract.

143.    In an E-mail on April 6th, the DH demanded that Professor Koltick return to work in-person by April 17th, noting that she had not requested a remote RA for the Spring semester. She advised Professor Koltick to reach out to HR about next steps, which she did.

144.    As she expressly stated in her appeal, Professor Koltick's condition was chronic, and she needed a fully remote work schedule for the foreseeable future. Therefore, her RA request was ongoing.

145.    Ms. Shannon agreed to schedule a meeting but reiterated the ongoing finality of the remote RA denial, and the DH emphasized that under no circumstances would a fully remote

work schedule be accommodated.

146. On April 18th the Dean ordered Professor Koltick to return to work in-person by May 15th.

147. Because of her disability, Drexel was aware that it was not physically possible for Professor Koltick to return to work in-person, but that she was continuing to perform all her duties remotely.

148. Had it been physically possible for Professor Koltick to return to work on campus in compliance with the Dean's directive, she would have done so.

149. On May 16, 2023, three weeks before the conclusion of the Spring Term, Professor Koltick received a letter from the Dean, "relieving her" of all of her administrative and professional duties and placing her on administrative leave pending a forthcoming disciplinary process for "job abandonment."

150. Having never spoken to Koltick about her accommodation needs or what she was working on that semester, the Dean stated that her network access would be disabled the next morning, thereby functionally confiscating all of her communications, professional work product, collaborations, files, research and data – the entire digital footprint she had created during her more than 15 years of teaching, research, scholarship and service to Drexel – all on less than 24-hours notice.

151. The Dean made no arrangements for the six students in Professor Koltick's graduate cohort now in the final stages of completing their thesis projects and preparing to defend them, and would not be left to do so without access to the thesis instructor and advisor who had been working individually with each of them since they began the program.

152.    Eventually a faculty colleague from a different program voluntarily stepped in to conduct Professor Koltick's remaining Thesis classes and provide some support for her graduate students, *all remotely*, which is exactly how Professor Koltick had been doing it.

153.    The Dean made no arrangements to support the international doctoral student in Digital Media whom Professor Koltick had been advising and collaborating with for the past two years on an ambitious, federally funded and highly specialized thesis project on Interaction and Urban Prosthetics, leaving him not only without his advisor and research partner and without the Lab he needed to continue his research, but forcing him to abandon his thesis altogether and start anew with another advisor on a brand new thesis he had not been intending to pursue, thereby derailing his Ph.D. program and adding two years to his degree trajectory.

**6.      Notice of Charges and Termination**

154.    On August 16th Drexel issued a Notice of Charges alleging that Professor Koltick had "refused" to return to in-person instruction by May 15, 2023, and that such "refusal" constituted abandonment of her job responsibilities and gross neglect of her duties.

155.    The Charges recommended to the Provost that he dismiss Professor Koltick "for cause," revoke her tenure, and terminate her employment from the University.

156.    At no time before Drexel terminated Professor Koltick's remote access to the workplace on May 16, 2023 had she neglected any of her responsibilities to the University, her colleagues, or her students. She continued to fulfill all of those obligations under very difficult and expedited circumstances and with the same high level of dedication, skill, and commitment she had demonstrated throughout the her career in the University.

157.    After a tenure revocation hearing in October, 2023, a Committee of the Faculty Senate rendered an advisory recommendation to the Provost that the Charges be upheld on the ground that Professor Koltick had willfully refused to return to campus to perform certain, albeit unspecified, teaching, research, and service duties on campus "as the essential duties of her position required."

158.    The extensive hearing record contains no evidence that Professor Koltick had the physical ability to return to work on campus, or that she deliberately refused to return as a matter of personal choice or insubordination, as Drexel contended, rather than by the dictates and circumstances of her disability.

159.    The Committee's conclusion that teaching in-person is an essential function of Professor Koltick's specific job in the University contradicts the undisputed evidence to the contrary devised and agreed upon by all parties during the November, 2021 RA process, and which undisputedly had not changed since then.

160.    The hearing record contains no evidence that on-campus presence is essential to any of Professor Koltick's service and research activities, as Shannon, Weyler, and the DH all admitted during the hearing, and as Professor Koltick's performance evaluations clearly show.

161.    There was no evidence that Drexel would have incurred significant difficulty or expense as defined by the ADA in providing Professor Koltick with a fully remote teaching schedule as an accommodation for her disability, either in her own department or elsewhere in Westphal College or the University.

162.    Drexel refused to consider affording Professor Koltick a remote work schedule based on the Provost's post-Covid mandate requiring all faculty return to work on campus,

regardless of personal circumstances, and the Dean's implementation of that policy in Westphal College.

163.    The Hearing Committee concluded that Professor Koltick "shut down" the IAP when she accepted Ms. Shannon's December 19th offer to "circle back and discuss" if the proposed "alternative accommodations" were not sufficient to meet her needs "and remote work is the only option."

164.    Not only is there no record evidence that Professor Koltick's request to discuss the matter further, as Ms. Shannon expressly offered to do, shut down the IAP, but that was not the basis for the denial of her RA request, not the basis for the denial of her HR appeal, and not the basis for the  disciplinary charges.

165.    Drexel fabricated a claim that Professor Koltick shut-down the IAP in retaliation for her opposition to Drexel's illegal refusal to provide her with a remote accommodation to which she reasonably believed herself to be legally entitled under federal and state law, and as a pretext for revoking her tenure and terminating her employment on disciplinary grounds.

166.    Drexel, not Professor Koltick, manipulated the statutory IAP process, excluded Professor Koltick from it, and treated her ongoing request for accommodation as gross misconduct instead of a well-established civil right.

167.    On January 3, 2024, the Provost notified Professor Koltick that her tenure had been revoked and her employment terminated.

168.    Drexel's actions against Professor Koltick have caused her to suffer distinct and palpable injuries, including the irrecoverable loss of academic opportunities, the revocation of

31

her tenure, the termination of her employment, the deprivation of her right to equal employment opportunity and the emoluments thereof, including the loss of, *inter alia*, her salary, leave accruals, and pension service credit, as well as emotional stress, the loss of the enjoyment of life, and other compensable injuries.

169.    Drexel's conduct was so extreme and malicious that it knew or certainly had reason to know that it would exacerbate Professor Koltick's disability, diminish her work capacity or deprive her of that capacity for a significant period of time, and would seriously impede or prevent her from securing comparable employment in any other institution of higher education in the country, thereby effectively and intentionally ending her academic career.

## VI.    STATEMENT OF CLAIMS

### COUNT I: FAILURE TO ACCOMMODATE

170.    The allegations set forth in Paragraphs 1-169 are re-alleged and incorporated by reference herein.

171.    Plaintiff is a qualified individual with a disability, a record of such impairment, and is/was perceived as such by Drexel throughout the relevant time period described herein.

172.    Professor Koltick was both qualified and entirely capable of performing the essential functions of her job with a remote work accommodation, which Drexel could have provided without undue hardship.

173.    Drexel's refusal to provide Professor Koltick with a remote work accommodation discriminated against her because of her disability and/or her need for accommodation, denied her the ability to access workplace, and impeded her enjoyment of equal terms and conditions of employment in relation to her colleagues without disabilities. 42 U.S.C. § 12112 (b)(5)(A); 42

U.S.C. §12111 (10) (A) & (B).

**COUNT II: DISCRIMINATION PURSUANT TO DREXEL'S BLANKET RETURN TO WORK MANDATE**

174. The allegations set forth in Paragraphs 1-173 are re-alleged and incorporated by reference herein.

175. The ADA forbids an employer from denying any employment opportunity to a qualified employee because of the need to make reasonable accommodation to the physical or mental limitations of that employee unless providing the accommodation would impose undue hardship. 42 U.S.C. §12111 (10) & §12112 (b)(5)(B).

176. Drexel illegally used an in-person work mandate to foreclose Professor Koltick from securing reasonable remote work accommodation regardless of her individualized circumstances on the basis of a blanket institutional policy, and then revoked her tenure on the ground that she had abandoned her job when it knew she could not access the workplace without a remote accommodation, and terminated her employment for gross misconduct when she was unable to return to work in-person because of her disability.

177. As a matter of law, Drexel's refusal to permit Professor Koltick to work at all unless she could do so in-person, without the accommodations she needed to access the workplace constitutes direct evidence of discrimination against her on the basis of her disability in violation of her rights under the ADA.

**COUNT III: INTENTIONAL DISCRIMINATION**

178. The allegations set forth in Paragraphs 1-177 are re-alleged and incorporated by reference herein.

179.    Drexel deliberately denied Professor Koltick remote work accommodations which were reasonable, inherently feasible, and would have allowed her to continue fulfilling all of the essential functions of her job, just as she had under the same accommodations during the past three academic years without undue hardship to Drexel.

180.    Drexel deliberately effecuated the revocation of Professor Koltick's tenure and then terminated her employment pursuant to a no-remote accommodations, no-exceptions policy that it knew or should have known violated the ADA.

181.    As set forth in this Complaint, Drexel attempted to camouflage its deliberately discriminatory actions on false and pretextual grounds, including, *inter alia*, a) fabricating an inability to provide Professor Koltick with the same ongoing accommodations it had been, and could have continued to afford her with no significant difficulty or expense, when it never considered doing so pursuant to its institutional policy; b) allowing administration to effectively hijack Drexel's established accommodation policies in pursuit of its blanket policy to force all faculty to return to campus, regardless of their individualized circumstances; c) weaponizing the statutory interactive process, Drexel's own employee evaluation process, and improperly using, manipulating, and falsely reporting data from its student course evaluations to impede Professor Koltick's RA request and provide a pretextual basis for denying it; d) purposefully and deceptively excluding her from any meaningful participation in the IAP and then accused her of refusing to participate; e) refusing to offer reasonable remote course assignments and manipulating course modalities to prevent her from fulfilling her course load obligations, f) denying the remote accommodation it knew she needed to access the workplace, and then charging her with job abandonment and gross misconduct when she was not able to return to

34

work in-person, g) fabricating a claim that she shut down the IAP and therefore gave up her statutory rights when she accepted HR's offer to interactively discuss her request for remote accommodation after Drexel denied it, and then using that as a pretextual basis for revoking her tenure and terminating her employment.

182.    There is no legitimate, non-discriminatory reason to explain or support Drexel's discriminatory actions against Professor Koltick, which were in deliberate and defiant violation of her rights under the ADA.

### COUNT IV: PROHIBITED STANDARDS, CRITERIA, OR METHODS OF ADMINISTRATION

183.    The allegations set forth in Paragraphs 1-182 are re-alleged and incorporated by reference herein.

184.    The no fully remote accommodations, no exceptions policy that Drexel applied to Professor Koltick constitutes a standard or qualification criterion that had the purpose or effect of discriminating against her and/or other similarly situated qualified individuals by foreclosing their ability to secure reasonable remote work accommodations without regard to their individualized circumstances. 42 U.S.C. §12112 (b)(3).

185.    No qualified person with a disability who needs a fully remote work schedule can meet such a requirement, and only employees with disabilities are disadvantaged by it

186.    Drexel's application of a blanket policy or mandate to a covered individual that requires in-person presence and forecloses remote accommodation regardless of her individualized circumstances is antithetical to the statutory requirement that employers provide reasonable accommodations that will enable an individual to perform the essential functions of

the job she holds or desires, with or without accommodation, unless such accommodation would constitute undue hardship. 42 U.S.C. §12112 (b)(3)(A).

### COUNT V: ILLEGAL STANDARDS THAT SCREEN OUT PEOPLE WITH DISABILITIES

187.    The allegations set forth in Paragraphs 1-186 are re-alleged and incorporated by reference herein.

188.    Standards that screen out or tend to screen out an individual with a disability constitute "discrimination" under the ADA unless those standards or criteria are job-related and consistent with business necessity.  42 U.S.C. §12112 (b) (6).

189.    Drexel's "decision and mandate" to refuse fully remote work accommodations to Professor Koltick for whom such accommodation was both reasonable and feasible constitutes an employment standard that screened her out of her employment on the basis of her disability and in violation of the ADA. 42 U.S.C. § 12112 (b)(6).

### COUNT VI: RETALIATION

190.    The allegations set forth in Paragraphs 1-189 are re-alleged and reincorporated by reference herein.

191.    The ADA forbids discrimination against any person because she has complained of or opposed any act or practice made unlawful by the Act, or participated in any manner in a proceeding related to the discrimination it prohibits. 42 U.S.C. §12203 (a).

192.    Professor Koltick engaged in protected activity under the Act, including, but not limited to, requesting reasonable accommodations, opposing Drexel's refusal to provide her with remote work accommodations to which she held a good faith belief to entitlement, and

vigorously defending Drexel's effort to revoke her tenure and terminate her employment on the ground that it violated her rights under the ADA.

193.    Drexel's actions against Professor Koltick as described above constitutes retaliation that is both causally connected to her protected activity, and was so materially adverse that it would deter or dissuade any reasonable employee from invoking, pursuing, or standing on their rights under the ADA.

194.    As set forth in this Complaint, Drexel manipulated the RA process to deny Professor Koltick a remote work accommodation and then pushed her out of the workplace and onto administrative leave, manipulated its own disciplinary process to charge her with gross misconduct, job abandonment, and neglect of her duties and then revoked her tenure on that basis and terminated her employment, thereby creating a disciplinary record and other barriers which were specifically and intentionally designed to destroy her career, taint her personal and professional reputation, and create other enormous impediments to her ability to secure comparable employment in any other university, all in retaliation for her protected activity and her opposition to Drexel's illegal actions.

195.    Drexel's treatment of Professor Koltick was materially adverse, threatening, and intimidating and would be so perceived by any reasonable employee and thus likely to dissuade them from asserting their rights, thereby interfering with the implementation of the Act itself and undermining its statutory purposes.

**COUNT VII: INTERFERENCE**

196.    The allegations set forth in Paragraphs 1-195 are re-alleged and reincorporated by reference herein.

197.    The ADA forbids coercing, intimidating, threatening, or interfering with an individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, the protections of the Act. 42 U.S.C. §12203(b).

198.    Drexel's failure to have policies that outline the disability accommodation process with sufficient detail to alert employees how to access accommodations, and in particular, provide an efficient and reliable process for locating alternative job assignments or other suitable employment options for employees who have been denied accommodations that result in a lack of access to the workplace, and therefore allows administration to interfere with and manipulate the process, impedes the implementation of the act and so impeded it for Professor Koltick.

199.    Drexel's actions have specifically interfered with Professor Koltick's rights under the ADA and tend to impede or interfere with the rights of others entitled to its protection, including, among other things, 1) the return to campus "policy and mandate" that forecloses remote work accommodations regardless of individualized disability-based circumstances, 2) using the disciplinary process to discourage or coerce an employee from foregoing an accommodation to which she is entitled, 3) intimidating her from requesting or pursuing an accommodation by threatening an adverse action; 4) subjecting her to adverse treatment because she requests and pursues an accommodation.

200.    Drexel interfered with Professor Koltick's rights under the ADA by denying accommodations to which she was entitled based on an erroneous standards and pretext, imposing policies and requirements purporting to limit her right to invoke her statutory protections, including a fixed no-accommodation, no-exceptions requirements, and threatening to and then revoking her tenure and terminating her employment on the basis of those illegal standards.

### COUNT VIII: PENNSYLVANIA HUMAN RELATIONS ACT

201.    The allegations set forth in Paragraphs 1-200 are realleged and incorporated by reference herein.

201.    Plaintiff is a person with a non-job related handicap or disability within the meaning of the Pennsylvania Human Relations Act. 43 P.S. § 955(a).

202.    For all the reasons Drexel's conduct as set forth in this Complaint in Counts I-VII, violates Professor Koltick's rights under the ADA, they also constitute discrimination pursuant to the Pennsylvania Human Relations Act, which forbids such discrimination to the same extent as the ADA does, and is to be interpreted and enforced in accordance with it. *Morgan v. Allison Crane & Rigging LLC,* 2024 U.S. App. LEXIS 22392 *8 n. 21 (3rd Cir. Sept. 4, 2024)(PHRA is to be construed consistently with the ADAAA except when that would operate in derogation of its purposes); *accord Cain v. Hyatt*, 734 F. Supp. 671 (E.D. Pa. 1990).

203     Drexel's conduct as recorded and alleged in this Complaint violated the PHRA by illegally failing to accommodate Professor Koltick (Counts I & II), intentionally discriminating against her (Count III); using blanket policies and other discriminatory policies or standards that foreclose by purpose or design remote accommodations to qualified individuals that are

otherwise reasonable and that impose no significant difficulty or expense on the employer and/or screens them out of their employment on the basis of their disability (Counts II, III, IV and V), retaliating against her for her protected activity (Count VI) and interfering with Professor Koltick's rights under the PHRA and/or impeding its purposes (Counts VII).

**WHEREFORE**, Plaintiff prays for the following relief:

1.     A declaratory judgment that the Drexel's actions as set forth herein violated Plaintiff's rights under the Americans with Disabilities Act, Section 504, *as amended*, and the Pennsylvania Human Relations Act.

2.     An injunction ordering Drexel to restore Plaintiff's tenure retroactive to the date of its revocation and reinstate her to her position as Associate Professor with a fully remote work schedule, full back pay and all the other emoluments of employment she would have received had it not been for the Defendant's illegal actions.

3.     An injunction ordering Drexel to expunge from her employment file all materials that have been generated during the course of, or as a result of, the disciplinary proceedings against her and/or that reflect that she was disciplined, terminated or otherwise dismissed for cause, gross misconduct, insubordination or any other workplace violation.

4.     Award Plaintiff compensatory damages for the losses she has or will sustain as a result of Drexel's illegal actions.

5.     Pursuant to the ADA, award Plaintiff punitive damages for Drexel's intentional and malicious actions against her.

6.    Award Plaintiff and her counsel all costs and attorneys fees they have incurred or will incur in the prosecution of this action under the ADA and PHRA as well as the underlying tenure revocation proceedings upon which it is based.

7.    Award all other relief which may be just and proper under the circumstances.

Respectfully Submitted:

By:    /s/_Lorrie McKinley_____
       **LORRIE MCKINLEY, ESQUIRE**
       Attorney I.D. No. 41211
       **McKINLEY & RYAN, LLC**
       238 West Miner Street
       West Chester, PA 19382
       (610) 436-6060

       **BRIAN J. FOLEY, ESQUIRE**
       Attorney ID No. 68806
       **LAW OFFICES OF BRIAN J. FOLEY**
       6701 Germantown Avenue, Suite 200
       Philadelphia, PA 19119
       267-930-4425

DATE:  May 20, 2026